UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

WILLIAM A. SMITH,                    )
          Petitioner                 )
                                     )      CIVIL ACTION
          v.                         )      NO. 04-11049-PBS
                                     )
UNITED STATES OF AMERICA,            )
          Respondent                 )
                                     )

## GOVERNMENT'S OPPOSITION TO MOTION TO VACATE VACATE, SET ASIDE, OR CORRECT SENTENCE, UNDER 28 U.S.C. § 2255

The government submits its Opposition to William Smith's ("Smith") Motion to Vacate, Set Aside, or Correct Sentence, Under 28 U.S.C. § 2255 (the "Motion" or "Petition"). As set forth herein, the Motion should be summarily dismissed.

### SUMMARY OF THE OPPOSITION

Smith filed his Motion on May 19, 2004, more than one year after the United States Supreme Court denied his petition for certiorari on March 24, 2003. United States v. Smith, 292 F.3d 90 (1st Cir. 2002), cert. denied, 538 U.S. 933 (2003)(March 24, 2003), reh'g denied, 538 U.S. 1054 (2003)(May 19, 2003). Accordingly, his Motion is time-barred pursuant to 28 U.S.C. §2255. His implicit claim that the one-year limitation period for filing a motion pursuant to §2255 was suspended by his filing a petition for rehearing of the denial of certiorari fails, as every court to address the issue has found. Even if Smith's Motion were not time-barred, his claims fail because he could have raised them on direct appeal and he fails to show cause for

his failure to do so, or actual prejudice from the claimed
violation.  In any event, the claims are wholly frivolous.

**RELEVANT FACTS AND PRIOR PROCEEDINGS**

Smith was charged in a one count indictment with possessing
a firearm and various rounds of .38 and .357 caliber ammunition
on or about November 5, 1996, in violation of 18 U.S.C.
§922(g)(1).  [D.1].[1]

1.  ***The offense of Conviction.***  In 1995, Smith lived for a
portion of the year at 5 Otisfield Street in Roxbury.  (Tr. III,
p. 83).  An acquaintance named Richard Bovill occasionally
visited him there. (Tr. III, pp. 82-83).  Bovill was a security
guard and owned several handguns, including a Taurus, .38 caliber
revolver, the firearm referenced in the indictment.  (Tr. III,
pp. 77, 79-80).  In August of 1995, Bovill went to Smith's
apartment to watch a boxing match.  (Tr. III, p. 83).  Bovill
brought a duffel bag which contained, among other things, the
loaded Taurus revolver, a holster for the Taurus, and a
Massachusetts permit allowing him to carry firearms.  (Tr. III,
p. 84).  At some point during the evening, Bovill took the gun
out of the bag, unloaded it, and handed it to Smith, who examined

---

[1]Citations are as follows.  The citation "[D._]" refers to a
docket entry.  Citations to the trial record are as follows:
"(Tr. #, p. __ );" the number refers to a volume of the trial
transcript, the first day being "Tr. I," the second day being
"Tr. II," etc.  Where there is more than one transcript for a
particular trial day, each will be referred to by letter, for
example, "Tr. II(a)" or "Tr. II(b)," and then the page.

it and remarked that he liked it.  (Tr. III, p. 87).  A few weeks
later, Bovill realized he could not find his gun, holster, or
permit and he eventually returned to Smith's apartment in search
of them, only to find the residence had been abandoned and
boarded-up.  (Tr. III, p. 88).

At some point prior to the summer of 1996, Smith moved to
apartment number 104 at 33 Wales Street in Dorchester.  (Tr. III,
p. 103).  Subsequently, Smith began selling cocaine powder and
"crack cocaine" from the apartment.  (Tr. III, p. 111).  A number
of people assisted Smith in his operation, including a woman
named Erica Moore.  (Tr. III, p. 111).  In late October of 1996,
Moore agreed to assist law enforcement officials investigating
Smith's drug activities.  Over a period of two weeks, between
October 22 and November 5, 1996, Moore made four controlled buys
of cocaine from Smith at the apartment.  (Tr. II, pp. 8-18; Tr.
III, pp. 121-24,127-28).

Notwithstanding her role, Moore also continued to purchase
cocaine from Smith for her own use.  (Tr. III, p. 124).  On
November 3, 1996, shortly before the last controlled buy, Moore
went to Smith's apartment to buy cocaine and, while in the living
room of the apartment, saw a gun next to Smith on the couch.
(Tr. III, pp. 124-125).  According to Moore, Smith repeatedly
looked down at the gun and back at her to make sure that she
noticed it.  (Tr. III, p. 126).  Moore reported her observations

3

to the police the next day, describing the gun as having a silver barrel and a brown wooden handle.  (Tr. III, p. 134).

On November 1, 1996, obtained a no-knock warrant to search Smith's apartment for evidence of drug-related activities, which they executed on November 5th, shortly after Moore made the final controlled purchase. (Tr. III, p. 128; Tr. II, pp. 16-19).  Smith and another male named Dwayne Sawyer were inside the apartment; Smith tried to flee through a door leading onto a porch but was ordered to return inside.  (Tr. V(a), pp. 48-49; Tr. II, pp. 21, 69; Tr. IV, pp. 26).

Among other things, officers found a blue bag on the floor of the living room with the wooden handle of a stainless steel revolver protruding from one of the unzipped compartments of the bag.  (Tr. II, p. 70).  Moore identified it as the firearm she had seen beside Smith in his living room on November 3rd, and Bovill testified that it was the same gun he had lost after showing it to Smith at Smith's prior apartment. (Tr. III, pp. 75, 80; Tr. V(a), p. 50).  The gun was loaded with six rounds of ammunition.  (Tr. II, p. 79).  In addition, officers found in the bag six rounds of .38 caliber ammunition in a "speed loader," seven  rounds of .357 caliber ammunition in a plastic box, a holster Bovill identified as the one he had brought with his gun to Smith's old apartment, a case for the speed loader, papers used for packaging cocaine, and a black knife Moore recognized as

4

belonging to Smith.  (Tr. II, pp. 79-92; Tr. III, pp. 81, 132).

Elsewhere in the apartment, police found a wallet containing two of Smith's IDs and Bovill's license-to-carry.  (Tr. II, pp. 23-24).  On Smith's person was found another wallet containing more of his IDs and $1,271 in cash, as well as a welfare card for Moore.  (Tr. III, p. 31).

Smith stipulated that he had previously been convicted of a felony, and that the firearm and ammunition had traveled in interstate commerce.  (Tr. V(a), pp. 62-63).

2.    ***The Sentencing Hearing.***  Smith was sentenced on May 19, 1999.  Given his status as an Armed career Criminal (ACC), Smith's Total Offense Level was set at 34 and the CHC at VI, <u>see</u> U.S.S.G. §4B1.4(b)(3)(A), rendering a range of 262 to 327 months, to which the Court sentenced Smith to the low end.

3.    ***The Direct Appeal***.  On appeal, Smith neither challenged his status as an ACC nor raised any of the issues he raises in his §2255 petition.  He raised three issues: (1) his inability to perfect his appellate claim -- based on a partially missing transcript, that this Court abused its discretion in admitting extrinsic act evidence under Rule 404(b); (2) whether this Court abused its discretion in admitting evidence that he was dealing drugs from the apartment; and (3) whether the Court erred in failing to grant a continuance <u>sua</u> <u>sponte</u> to give Smith time to incorporate newly-received materials regarding Erica Moore.  On

June 11, 2002, the Court of Appeals rejected Smith's arguments
and affirmed the judgment of conviction.  United States v. Smith,
292 F.3d 90 (1st Cir. 2002).

    **4.**   ***Smith's Attempts to Obtain a Writ of Certiorari.***  Smith
subsequently filed a petition for certiorari and the Supreme
Court denied it on March 24, 2003.  Smith filed a second petition
for a rehearing and the Supreme Court denied it on May 19, 2003.
Smith then filed his §2255 petition a year and a day later, on
May 19, 2004.

    **ARGUMENT**

**I.**  **General Principles Governing Smith's §2255 Motion**

    Under 28 U.S.C. § 2255, Smith is not entitled to relief
unless he can establish that his conviction was in violation of
federal law and that the violation involved a "fundamental defect
which inherently results in a complete miscarriage of justice,"
or "an omission inconsistent with the rudimentary demands of fair
procedure."  Hill v. United States, 368 U.S. 424, 428 (1962);
United States v. Addonizio, 442 U.S. 178, 185 (1979).

    To obtain relief under § 2255, the Motion must be made
within the one-year limitation period established by the statute.
In 1996, Congress amended § 2255 as part of Antiterrorism and
Effective Death Penalty Act of 1996 ("AEDPA").  The amendment
imposed a one-year limitation period for the filing of motions
pursuant to § 2255.  See Pub.L. No. 104-132, Title I, § 105, 110

6

Stat. 1214 (Apr. 24, 1996).  According to § 2255 as thus amended, the limitation period runs from the latest of:

> 1. the date on which the judgment of conviction becomes final;
>
> 2.  the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> 3.  the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> 4.  the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255.

In his statement claiming that the Motion is timely filed, Defendant's Memorandum ("Def.'s Mem.") at ii, Smith does not rely on §2255(2), (3) or (4) as justifying the timing of his filing of the Motion.  Rather, he states that he filed within one year of May 19, 2003, the date on which his petition for rehearing of the Supreme Court's denial of a writ of certiorari was denied.  Id.

As set forth below, Smith's analysis of the §2255 timing requirements is fatally flawed.  Where, as here, a defendant petitions for certiorari to the Supreme Court following the Court of Appeals' affirmance of his conviction, the one-year period of limitation begins to run from the date the Supreme Court denies the petition for certiorari, and a subsequent petition for

7

rehearing on the denial of the cert. petition does not toll the clock. Because the Supreme Court denied certiorari on March 24, 2003, the Motion, filed on May 19, 1999, is untimely.

Further, even if the Motion had been timely filed, in order to obtain relief under §2255, Smith "must clear a significantly higher hurdle than would exist on direct appeal." Frady, 456 U.S. at 166. It is equally clear that a petitioner may not use a §2255 action as a "substitute for direct appeal." Knight v. United States, 37 F.3d 769, 772 (1st Cir. 1994); Frady, 456 U.S. at 165. Claims not raised on direct appeal cannot be raised on collateral attack absent a showing of (1) good cause for the failure to raise them originally, and (2) resulting actual prejudice. Knight, 37 F.3d at 772-73, 774; Frady, 456 U.S. at 165; see also Smullen v. United States, 94 F.3d 20, 23 (1st Cir. 1996).

Conversely, claims which were raised and decided on appeal may not be relitigated in a Motion brought under §2255, absent "exceptional circumstances where the need for the remedy afforded by the [statute] ... is apparent." Robson v. United States, 526 F.2d 1145, 1147 (1st Cir. 1975)(quoting Desmond v. United States, 333 F.2d 378, 380 (1st Cir. 1964)).

II. **The Motion Must be Dismissed as Untimely Filed**.

As set forth above, the Supreme Court denied Smith's petition for certiorari on March 24, 2003. United States v.

8

Smith, 292 F.3d 90 (1st Cir. 2002), cert. denied, 538 U.S. 933 (2003).  Thereafter, Smith petitioned the Supreme Court for a rehearing of its denial of certiorari.  The Supreme Court denied the petition on May 19, 2003.  Smith v. United States, reh'g denied, 538 U.S. 1054 (2003).  The Motion followed on May 19, 2004.

Smith's Motion implicitly suggests, without supporting legal authority, that his petition to the Supreme Court for rehearing had the effect of suspending the period of limitation for filing his Motion under § 2255.  That suggestion is contrary to the plain text of the relevant Supreme Court Rule and to precedent interpreting that Rule.

Supreme Court Rule 16 governs the disposition of a petition for a writ of certiorari.  The Rule provides in relevant part:

> Whenever the Court denies a petition for a writ of certiorari, the Clerk will prepare, sign, and enter an order to that effect and will notify forthwith counsel of record and the court whose judgment was sought to be reviewed.  **The order of denial will not be suspended pending disposition of a petition for rehearing except by order of the Court or a Justice.**

Sup.Ct. R. 16.3 (emphasis added).  As the Rule thus provides, a petition for rehearing of the denial of certiorari, unlike a petition for rehearing in the court of appeals, does not automatically suspend "[t]he order of denial" of a petition for certiorari.  Indeed, in the absence of an order of the Supreme Court or a Justice thereof, of which there is no evidence here, a

9

petition for rehearing of the denial of certiorari has no effect.

Applied to the present case, Rule 16.3 demands the conclusion that Smith's judgment of conviction became final when the Supreme Court denied his petition for certiorari on March 24, 2003.  Indeed, although the First Circuit apparently has not yet addressed it, every Court that has addressed the question of when, under §2255, a judgment of conviction becomes final for a prisoner who has petitioned for certiorari, has interpreted Supreme Court Rule 16.3 as controlling, and has held that a judgment of conviction becomes final under §2255 when the Supreme Court denies certiorari.  See Campa-Fabela v. United States, 339 F.3d 993, 993-994 (8th Cir. 2003)(Judgment became final for purposes of §2255 when Supreme Court denied cert. petition, and not when Court denied the subsequent motion for rehearing); United States v. Segers, 271 F.3d 181, 184-185 (4th Cir. 2001)(Per Rule 16.3, defendant's drug convictions became final for §2255 purposes on date when Supreme Court denied petition for writ of certiorari rather than on later date when Court denied petition for rehearing); see also United States v. Willis, 202 F.3d 1279, 1280-1281 (10th Cir. 2000)(Under Rule 16.3, judgment of conviction is final for purposes of one-year limitation period in §2255 when Supreme Court denies cert. petition, regardless of whether a petition for rehearing from the denial is filed); Giesberg v. Cockrell, 288 F.3d 268, 270 (5th Cir. 2002)(§2255

10

one-year limitations period began to run when Supreme Court denied cert. petition, and petition for rehearing did not toll clock); <u>Horton v. United States</u>, 244 F.3d 546 (7th Cir. 2001)(one-year limitations under §2255 begins when Supreme Court denies cert. petition); <u>Washington v. United States</u>, 243 F.3d 1299, 1300 (11th Cir. 2001)(same); <u>United States v. Kazandjian</u>, 2002 WL 31269534, *1 (9th Cir. (Cal.))(same).

Here, Smith has not alleged or shown that he ever applied for a suspension of the denial of his petition for a writ of certiorari by the Supreme Court or a Circuit Justice. Accordingly, the judgment of conviction became final for purposes of AEDPA's one-year limitations period when the Supreme Court denied his petition for certiorari on March 24, 2003.  Because he did not file the petition until May 19, 2004, almost 14 months later, his petition is time barred by §2255 and must be dismissed.

**III.  <u>The Claims All Fail on the Merits.</u>**

Smith raises nine arguments in support of his Motion.[2]  In the interests of brevity, the government notes at the outset that each of the arguments suffers from two, significant defects

---

[2]Smith's ninth argument is nothing more than a catch-all argument that each of the three attorneys he had at the trial, sentencing and appellate stage, respectively, provided ineffective assistance of counsel.  As discussed herein, the claim must fail where none of Smith's specific claims has any merit.

11

(aside from their untimeliness) which makes reaching the merits unnecessary.  First, each argument either rests on utterly unfounded or unsupported assumptions[3], or asserts a statement that is true but legally irrelevant.[4]  In addition, and as noted above, all of the claims fail under the "cause and prejudice" standard since they were not raised on direct appeal and Smith makes no attempt to explain his failure to do so.  See Brache v. United States, 165 F.3d 99, 102 (1999).  To the extent Smith seeks to circumvent this failure by alleging it to be the result of ineffective assistance of counsel, see Knight v. United States, 37 F.3d 769 (1st Cir. 1994)(claims barred by failure to satisfy cause and prejudice standard may be reviewed where failure was due to ineffective assistance of counsel), the claims still fail because each is meritless if not frivolous.

A.  The "Oath-of-Office" Lack of Jurisdiction Claims.

Taking his first two arguments together, Smith contends that the U.S. Attorney was without jurisdiction to prosecute him --

---

[3]For example, Smith simply asserts without elaboration that none of the three prosecutors took or filed the oath of office (Arguments 1 and 2).  He similarly claims with no support that the AUSA's committed and suborned perjury before the grand jury and at trial (Arguments 3 and 4).

[4]For example, Smith correctly states that the government did not file a notice to enhance his sentence under 21 U.S.C §851, but that statute is implicated only where one has been convicted of violating the Controlled Substances Act and thus is inapplicable here where the defendant was convicted of a firearms offense.

and the Court, therefore, without jurisdiction to hold a trial, because the government failed to prove that the requisite oaths of office were executed and filed by then U.S. Attorney Donald Stern, and by Assistant U.S. Attorneys Robert Richardson and Donald Cabell.  These claims, unsupported by even a shred of evidence, are baseless.

A Section 2255 motion must be granted if "the court was without jurisdiction to impose . . . sentence."  28 U.S.C. § 2255.  "If the court finds that the judgment was rendered without jurisdiction . . . the court shall vacate and set the judgment aside and shall discharge the prisoner . . . ."  Id.  28 U.S.C. § 544 provides that each U.S. Attorney, Assistant U.S. Attorney and specially-appointed U.S. Attorney shall, before taking office, take an oath to faithfully execute his duties.  Section 544's oath has been found to be a necessary condition precedent to the exercise of authority of a specially appointed Assistant U.S. Attorney and the failure to meet that condition deprived him of authority to act on behalf of the United States.  See United States v. Pignatiello, 582 F.Supp. 251, 253 (D.Co. 1984).  5 U.S.C. § 2906 provides that the oath shall be delivered to the agency to which the office pertains.

That being said, Smith bears the burden of proof on a Section 2255 motion, which he simply does not even try to meet here.  United States v. Taveras, 230 F.Supp. 2d 126 (D. Ma.

13

2000).  There is a presumption from the undisturbed exercise of a public office that an appointment to such office is valid. Levine v. United States, 221 F.2d 941, 943 (7th Cir. 2000) *quoting* United States v. Mitchell, 136 F. 896, 906 (C.C.D. Or 1905).  Here, since Smith offers no evidence to support his claim that the then U.S. Attorney and the AUSA's failed to take or file their respective oaths of office, the presumption alone defeats the claim and it therefore merits no further attention.

   B.  Alleged False Evidence Presented to the Grand Jury.

   Smith alleges that the government "used false documentation and statements to receive the indictment."  Def.'s Mem. at 14. Specifically, Smith contends that the undersigned AUSA knowingly introduced false testimony at the grand jury that he rented apartment number 104 at 33 Wales Street when it knew that a man named Joe Turner was the actual renter.

   This claims fails easily.  First, of course, the government denies that it presented any false evidence to the grand jury, knowingly or otherwise, and to that extent vehemently denies Smith's claim.  But even assuming false testimony or evidence was somehow presented to the grand jury, any defect was cured by Smith's conviction at trial.  See Lopez v. Riley, 865 F.2d 30, 32 (2d Cir. 1989).  Finally, Smith surely cannot be heard to claim that he might not have otherwise been indicted or convicted. Indeed, while one true issue at trial was whether Smith

14

<u>controlled</u> the apartment, the evidence unambiguously showed that
the apartment was rented under the name "Joe Turner." <u>See</u> <u>United</u>
<u>States v. Smith</u>, 292 F.3d at 92.  Thus, in convicting Smith, the
jury, while finding Smith possessed a gun in apartment 104, knew
that he was not the named lessee, and deemed that fact
irrelevant.[5]

     C.  <u>Alleged False Evidence Introduced at the Trial.</u>

     Without elaboration, Smith contends in cursory fashion
through Arguments 4 and 8 that much of the testimonial evidence
the government introduced at trial was either false or
contradicted by other evidence.  He contends similarly that
tangible items such as photographs were falsified to support the
government's case.  It is virtually impossible to respond to each
of the many undeveloped, unsupported allegations contained in
these arguments, except to offer three observations.

     First, the government again vehemently denies the allegation
that it knowingly suborned perjury, and notes that the
defendant's argument rests entirely on bare assertions rather
than credible evidence, e.g., affidavits from others stating that
they knowingly made false statements or knew of others that did.

_____

    [5]Presumably, the jury found it relevant that (1) Smith was
dealing drugs from the apartment and appeared to be in control of
it; (2) Erica Moore claimed to have seen Smith in possession of
the firearm, and (3) there was absolutely no evidence that Joe
Turner, whoever he is, frequented the apartment around the time
the firearm was found there.

Second, the majority of the "contradictions" or "false" statements that Smith alludes to are in fact nothing more than inconsequential minor differences between the witnesses' recollection of events, or mere differences of semantics in expression.[6]  Third, and when all is said and done, the jury was presented with all the evidence and was in the best position to assess the evidence, both piecemeal and as a whole, and what weight to give it.

In finding Smith guilty, the jury may in fact have disbelieved some of what one or more witnesses said, but clearly believed he constructively possessed the firearm as charged. Given all the evidence regarding Smith's control over the apartment, his argument does not come close to suggesting the verdict was in error.

D.  No one was Required to Have Erica Moore Examined.

In a rambling argument bordering on the incomprehensible, Smith, focusing on Erica Moore's mental history, argues that both the government and his trial counsel should have had her examined for competency before having her take the stand.  Smith further

---

[6]For example, Smith states at page 16 that BPD Officer Mary Crowley stated in a pretrial hearing that she field tested drugs from a controlled buy for "crack cocaine" while Officer Greeley stated at trial that he field tested drugs for "powder cocaine." Regardless of whether one characterizes this as a contradiction, inconsistency, slip of the tongue, or simple mis-recollection, it hardly amounts to hard and fast proof of the suborning of perjury.

contends that AUSA Richardson coerced or influenced her
testimony, and further violated her Fifth Amendment right against
self-incrimination by forcing her to acknowledge under oath that
she was using drugs.  From there, Smith inexplicably then
switches horses mid-stream and takes issue with the testimony of
Bovill and that of the gun dealer who sold him the firearm.
Def.'s Mem. at pp. 18-22.

Given that Smith bears the burden of proof, the Court should
summarily dismiss this claim in light of Smith's failure to cite
any authority for the proposition that the government was
required to seek a competency hearing before calling Moore to
testify.  Smith's true gripe here appears to be that Moore's
anticipated testimony should have viewed as presumptively
incredible given her background.  In that vein, Smith had
voluminous records regarding Moore's history and conducted a
lengthy and vigorous cross examination regarding her mental
health history.  Put another way, if Moore's testimony was not to
be believed, Smith had ample opportunity to demonstrate that to
the jury.  Obviously, in finding Smith guilty, the jury believed
her in spite of her past issues.

    E.   <u>The Defendant was Properly Sentenced as an ACC.</u>

Through Arguments 6 and 7 Smith raises several disjointed
arguments linked only by the fact that they appear to relate
generally to the sentence he received.  Rather than attempt to

17

parse and respond to each potential argument, it suffices to point out that Smith was classified as an ACC and does not in his Motion challenge any of the three ACC predicates as found by the Probation Office.  Because he does not, and because his sentence was calculated entirely on the ACC Guidelines provisions at U.S.S.G. §4B1.4, his claims are not material and thus need not be considered.[7]

**CONCLUSION**

Based on the foregoing, the government respectfully requests that the Court dismiss Smith's §2255 petition without an evidentiary hearing since it is either barred as a matter of law or the record demonstrates that it is without merit.

---

[7]Finally, Smith's claim that his three lawyers all provided ineffective assistance of counsel must fail.  In Strickland v. Washington, 466 U.S. 668 (1984), the Court, held that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  Id. at 686.  The Court formulated a two-prong test for evaluating counsel's performance. To establish a violation of the Sixth Amendment, a defendant must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant, resulting in an unreliable or fundamentally unfair outcome of the proceeding.  Id. at 687. Given that none of Smith's claims has any merit, he cannot show prejudice even if his counsels' performance were found to be inadequate.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    /s/Donald L. Cabell
Donald L. Cabell
Assistant U.S. Attorney

DATED:    August 20, 2004.

CERTIFICATE OF SERVICE

This is to certify that I have served upon the person listed below a copy of the foregoing document by depositing in the United States mail a copy of same in an envelope bearing sufficient postage for delivery:

William A. Smith
Inmate No. 21442-038 J-A
FMC Devens
P.O. Box 879
Ayer, MA 01432

Donald L. Cabell
ASSISTANT UNITED STATES ATTORNEY

19